# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

PATRICIA A. KING,

      Plaintiff,

vs.

PEG FREY, TERRY MEIER, and
WATERLOO COMMUNITY SCHOOL
DISTRICT,

      Defendants.

No. C05-2036

**ORDER**

_____

This matter comes before the court pursuant to Defendants Peg Frey, Terry Meier, and the Waterloo Community School District's March 1, 2006 motion for summary judgment (docket number 11). The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. For the reasons set forth below, the defendants' motion for summary judgment is granted.

### Procedural Background

Patricia Ann King brought this pro se employment discrimination action against Defendants Peg Frey, Terry Meier, and the Waterloo Community School District. The plaintiff claims that the defendants subjected her to racial discrimination when her employment with the Waterloo School District was terminated, and that she was harassed and retaliated against in violation of Title VII of the Civil Rights Act of 1964[1] (Title VII) and the Iowa Civil Rights Act[2] (ICRA). The plaintiff further claims that she was

---

[1] Codified at 42 U.S.C. 2000e.

[2] Codified at Iowa Code Chapter 216.

terminated without being afforded her right to procedural due process. Among other relief, the plaintiff seeks reinstatement to her position within the Waterloo School District.

**Statement of Material Facts Taken in a Light Most Favorable to the Plaintiff**

On February 3, 1998, Ms. Cora J. Turner, Administrative Facilitator with the Educational Discipline Center in Waterloo, Iowa, wrote a letter to the plaintiff memorializing some "recent conversations" between Ms. Turner and the plaintiff concerning "staff, student and parent relationships, classroom management and student grades." Ms. Turner wrote, in relevant part:

> Over the past few months I have met with you on the issue of staff and student relationships, staff respect and the tone used in your classroom. I have also provided you and other members of the staff with various articles on discipline and staff self-esteem offering suggestions on the role of the teacher in the classroom. . . . I had a closed door meeting with you about discipline and classroom management issues. Next, I have helped you in the classroom several times by coming into modify the manner [in which] to issue discipline. . . . [Y]our present style of communicating with staff, students and parents appears not to be in the best interest of EDC's mission and goals and is unacceptable. The behavior of several students . . . escalates when put in the position of a confrontational voice tone which you commonly practice in your classroom. This makes it very difficult for us to support you when we're meeting with students and parents. . . . Also, when I request you not to contact a parent, allowing me to handle the situation, I expect my request to be followed. . . . [Y]ou must become more aware of your voice tones and the manner you issue discipline in teaching, working with other adults and students and communicating. . . . We need to work together to improve the manner in which you present your ideas and to minimize the opposition I observed you are receiving from the students, parents, and staff.

Following this letter, the plaintiff attended a meeting with Ms. Turner and Mr. Ray Richardson, Principal of the Educational Discipline Center, on February 12, 1998.

Ms. Turner wrote a letter memorializing that meeting and sent it to the plaintiff on February 27, 1998. The letter stated, in relevant part:

> The three areas of concern we addressed with you were:
> (1) <u>Voice Tone</u>- the tone used when you communicate with staff, students and parents must be on a more professional level.
> (2) <u>Classroom Control</u>- as a teacher you are to be in control of your classroom, students need to be in the class to learn and sending them out should be the last resort.
> (3) <u>Communication</u>- effective communication is essential in the educational field. As professionals, we must maintain positive relationships to be effective.
>
> I plan to continually visit your class to assist you whenever necessary.

Ms. Turner wrote another letter to the plaintiff on March 11, 1998, following a second observation of the plaintiff's classroom. In her letter, Ms. Turner indicated the following concerns:

> In checking your lesson plans . . . you complete your lesson plans by the week. You indicated that sometimes you wait to fill out some days because changes do occur. Although that may be true, I would suggest that you complete lesson plans so that the curriculum is covered sequentially regardless of changes that may occur. I am attaching a copy of district policy pertaining to lesson plans. . . . I also note a concern in how the [spelling] words are checked. You ask the students to spell a word you identify and then if they misspell the word you go on to the next student, leaving the student who got the word wrong looking somewhat foolish and embarrassed. . . . I would note that students refuse to follow directions either verbally or passively by non-compliance.
>
> . . .
>
> As for classroom management, I have some concerns. Your students are not hearing or learning what you are trying to offer. Your present approach does not engage students in a way that keeps them from controlling what's happening in your classroom. I believe you have a grasp of the curriculum

and its content, however, there is considerable evidence (i.e. student grades and discipline issues) that students are not learning to the level they can and what is expected.

The district policy pertaining to lesson plans, referenced by Ms. Turner in her letter to the plaintiff, provides in relevant part, as follows:

The lesson plan book should be completed on Friday, or the last day of the week, for the following week. . . . Effective instruction includes thoughtful and careful planning. Therefore, each member of the teaching staff is required to complete lesson plans on a continuing and regular basis that reflect the District's curriculum and learning outcomes. These lesson plans may be requested by the administration and may be used as part of the evaluation process.

On March 12, 1998, Ms. Turner wrote a letter to the plaintiff memorializing certain events that had taken place on March 2, 1998. The letter stated, in relevant part:

On March 2, 1998, a student requested I meet with you concerning her homework which she reported was completed and turned in. When I came to your class you were in the process of looking for the student's work and you were quite sure the work had not been completed. As the three of us continued to search . . . it was located in her file and it had been graded. . . . In the process of looking for this particular student's work at least six( (6) bags of students' papers, graded and ungraded were discovered in various places of your room.

Ms. Turner went on to explain that she had concerns arising from this incident. Ms. Turner requested that the plaintiff report back to her indicating when she finished reviewing each student's work that had been located in the bags.

Principal Richardson completed an evaluation concerning the plaintiff's employment performance on March 13, 1998. He evaluated that the plaintiff needed improvement in using clarity in presentation, providing variability in materials and activities, providing an opportunity for pupils to learn the concepts over which the pupils will be evaluated, utilizing student ideas, using positive, encouraging, and supportive criticism, being tolerant, being fair, being available, recognizing the instructional value of her own silence,

developing an environment conducive to learning, promoting businesslike or task-oriented behavior on the part of the students, adapting the instructional material to an appropriate level of difficulty, using class time efficiently, providing work which is relevant and in sufficient amounts for in-depth learning, following course of study, developing appropriate lesson plans, having objectives and teaching toward those objectives, showing enthusiasm, making classwork interesting, sharing with pupils the enjoyment of humorous situations, being a good team worker, reporting pupil progress to parents in an effective manner, utilizing community resources for instruction, assuming responsibility outside the classroom as they relate to school, striving for improvement through positive participation in professional growth activities, attempting to correct mannerisms which detract from effective teaching, and exhibiting emotional stability, tact and good judgment. Principal Richardson further opined that the plaintiff was performing at an unsatisfactory level in developing and using probing questions which lead to better understanding of concepts, relationships and feedback, setting an atmosphere of mutual respect among students and between students and teachers, constantly monitoring pupil's progress and adjusting the pace of instruction and/or placement accordingly, and inspiring students to seek more knowledge on given subjects. Principal Richardson evaluated that the plaintiff's employment performance was satisfactory in dressing and grooming appropriately, exhibiting vitality, and being punctual. He evaluated the plaintiff's overall performance as unsatisfactory as opposed to satisfactory. The plaintiff signed at the foot of this evaluation form, directly below a clause indicating that "[s]ignatures indicate completion of the conference."

Principal Richardson and Ms. Turner authored a letter to the plaintiff on March 26, 1998, concerning the plaintiff's March 13, 1998, evaluation. The letter includes, in relevant part, the following:

> Ms. King, we have indicated to you that we feel you have the tools, i.e. knowledge of curriculum and content, however, your instructional skill and technique requires work. . . . Too

much time is spent on classroom management issues and very little time on instruction. At present, we must recommend that you be put on a plan of assistance and reevaluated during the upcoming 1998-99 school year. We also request that you consider a different level to teach. Middle school students are very challenging in normal situations, and extremely difficult at the Discipline Center. We do recommend that you consider another program that would better suit your skills and abilities. In the meantime, we will continue to assist you in getting through this school year. . . . Please regard this memo as a serious matter with serious consequences. Our goal is the education of the students under our care and every effort to teach them is our one and only priority.

The record includes letters from several students' parents indicating concern over the plaintiff's teaching practices. Specifically, parents complained that the plaintiff excessively disciplined their children, was unwilling or unable to effectively communicate with the parents concerning issues in the classroom, and had lost some of the students' work but had falsely accused some of the students of never having turned in that work. One letter, written by a school guidance counselor, indicates that the guidance counselor encountered difficulty communicating with the plaintiff concerning the issue of lost, misplaced, and ungraded work.

The plaintiff has submitted several letters from fellow teachers, classroom volunteers, and students' parents, opining that the plaintiff was a successful and dedicated teacher. John Barker, a fellow seventh grade teacher, indicated that he had encountered difficulty with the administration concerning supporting the efforts by him and other teachers to discipline the students. Mr. Barker wrote, in relevant part, as follows:

Students were being disrespectful to staff and they received a slap on the wrist. . . . Teachers were yelled at, swore at, and [were] penalized for trying to get students to be accountable. It was a very frustrating and sometimes hostile environment. I am an African American Male and I was questioned about my experience and credentials. I was always being second guessed by parents and their students. . . . Also, a lot of miscommunication was happening. Sometimes staff would be

told one thing and the parents and students would be told something totally different.

The record contains numerous letters from concerned parents regarding the plaintiff's teaching and grading techniques. Chief among the parents' complaints are concerns regarding the accuracy of the plaintiff's grading and record keeping, especially in connection with purportedly missing assignments, many of which assignments were later discovered to have actually been completed but not graded and/or recorded.

A Notice of Personnel Action form was completed and submitted to the Waterloo Community School District Board on May 29, 2001. According to the form, the plaintiff was being re-assigned to a teaching position at Hoover Middle School, filling a vacancy for seventh grade reading and language arts.

Principal Terry Meier, of Hoover Middle School, wrote a letter to the plaintiff on October 15, 2001, indicating concerns regarding the plaintiff's grading practices. The letter states, in relevant part, as follows:

> . . . you informed me that you did not have your current grades on 'Grade Quick' in the computer. You said, you had a headache and would not put them in until Monday. Classroom grades should be entered . . . in a timely manner. In a meeting held September 27th, you were informed and agreed that 5 to 10 grades would be entered in the grade book by 10:00 a.m. on Fridays. This was clearly not accomplished. The Basic Skills tests were given the entire week of October 8th. This allowed sufficient time to enter your grades . . . [but] [a]gain, this was not accomplished. My expectation is that grades will be entered . . . in a timely manner. If you need assistance in learning how to do this within the expected time limit, please let Mrs. Frey know so that it can be provided. . . .

Principal Meier sent a letter to the plaintiff voicing similar concerns regarding missing or untimely recorded grades on November 1, 2001. In his letter, Principal Meier discussed the following plan to remedy his concerns:

> We need to assist you in developing comprehensive goals that
> will allow students to master the material and at the same time
> hone your skills with good teaching practices. This will
> include mentoring, action research on effectiveness of teaching
> strategies, and the development of organizational skills.
> Classroom management will also be a component. This plan
> will begin immediately and [be] monitored frequently to
> remediate needed areas. Mr. Frey and I will be directly
> involved with this area.

A memorandum dated November 28, 2001, memorializes a meeting involving the plaintiff, Mr. Meier, and Mrs. Frey. According to the memorandum, the topics discussed during the meeting included (1) grading and organization of student work; (2) computer lab use; and (3) subject and length appropriateness of student assignments.

Mr. Meier wrote a letter to Dr. Beverly Smith on December 4, 2001, concerning the plaintiff's second quarter mid-term grading. The letter states, in relevant part:

> At 8:00 a.m. on December 3rd, you [the plaintiff] informed
> me that your grades would not be done by the designated
> time. . . . During your first evaluation conference December
> 3rd at 3:00 p.m., I asked if the grades had been sent to the
> server. Your reply was that they had not been sent at this
> time. My comment to you was that you would be 'written up'
> and this document would then be sent to your personnel file.
> This is the third grading report period that you have not
> completed your grades in a timely manner . . . [i]n the future,
> I expect all deadlines to be kept.

A student, via the student's parents, completed a "Complaint Form for Allegations of Harassment And/Or Discrimination And/Or Violation of District Policy" form on January 11, 2002, concerning the plaintiff. The student complained that the plaintiff had harassed the student on the basis of disability. The description of the plaintiff's offensive conduct, according to the student, was as follows:

> Not providing grades in a timely manner, [n]ot complying with
> . . . IEP and providing a hostile work environment towards
> [the student].

Principal Meier issued a written reprimand to the plaintiff on February 25, 2002, complaining that the plaintiff was supposed to have handled a student issue concerning missing grades and had failed to timely do so. According to the reprimand, a student's parent had requested a list of missing assignments, and the plaintiff never produced the list. Principal Meier wrote:

> It is my expectation of all teachers to provide information to any parent making a request in this manner. Since you were unable to follow the request, I am issuing this written reprimand. It is my expectation [that] this situation will not occur again.

The plaintiff signed the reprimand.

Principal Meier completed an evaluation form that was reviewed with the plaintiff on March 25, 2002. Principal Meier evaluated that the plaintiff's overall performance was unsatisfactory. In his evaluation Principal Meier opined that the plaintiff needed to (1) better adjust her teaching materials overall to meet students' learning goals; (2) develop effective demonstrations of the subject matter and create an environment in which students feel comfortable asking questions about assignments; (3) develop a system of efficiently returning assignments to students and discussing errors on those assignments; (4) develop a more efficient system of record-keeping and a method of reporting missing assignments to parents; and (5) utilize resources, including other teachers, to develop a variety of lessons "in order to have the ability to teach to more learning styles." The plaintiff signed her name on the form indicating that she and Principal Meier had conferenced about the evaluation, and wrote "[t]his signature agrees that material was discussed, but I disagree with evaluation comments."

Principal Meier wrote a response to the plaintiff, concerning a meeting held April 25, 2002 between the plaintiff and Principal Meier, on May 1, 2002. Principal Meier wrote, in relevant part:

> Your response to helping students with problems in class is not acceptable for any teacher at Hoover Middle. If a student aks

for help on an assignment, you need to help the student. Your saying that you gave the directions to the assignment and the student did not try to do the work does not excuse you from your responsibility to give the student help. . . . When your directions consist of reading the directions on a worksheet, it does not surprise me that you have certain students not understand how to do the work. . . . They need examples shown to them. It is my expectation that you will provide assistance to a student asking for help on an assignment.

On May 2, 2002, Principal Meier wrote a "Letter of Reprimand" to the plaintiff concerning mid-term grades. Principal Meier was concerned that the plaintiff's grades were approximately one day late in being turned in. He wrote, "you have not sent your grades to the server on time yet this school year." Principal Meier further wrote that "[g]rades need to be sent to the server by Friday, May 30, 2002 by 3:00 p.m.. It is my expectation that you will have these grades sent to the server at this time as this becomes a contract issue." Principal Meier wrote another "Letter of Reprimand" to the plaintiff on May 8, 2002. Principal Meier was concerned again about the plaintiff's grading techniques, writing that

> [w]e are experiencing a number of phone calls from parents regarding student grades. Their complaints deal with assignments that have been turned in to you but have not been placed in the grade book. There is a stack of papers on your desk that have yet to be placed in the grade book. It is not fair to students to have a large number of assignments not recorded before mid-term grades are sent to parents.

On August 12, 2002, the plaintiff signed a teacher contract with the Waterloo Community Schools for the 2002-2003 school year. On October 29, 2002, Principal Meier wrote a "Spelling Directive" concerning the plaintiff's teaching practices. Principal Meier wrote:

> As was discussed in my office today with Mrs. Frey, [and] Ms. King . . . regarding how spelling is graded in Ms. King's Language Arts classes. Ms. King will not count a word misspelled if the only problem with the spelling is that a small

> case letter is larger than the other letters in the word.  We are
> grading spelling, not handwriting.

Principal Meier authored a directive concerning the plaintiff's grading on January 21, 2003.  He indicated concern that the plaintiff continued to have difficulty entering grades in the electronic grade book in a timely manner.  Principal Meier recorded the following plan concerning the plaintiff's grading:

> In the future, Ms. King will have 5 workdays to have the assignments graded and recorded in the computer grade book. It would be better if the grades were entered in the grade book sooner than this, however, 5 school days is more than enough time to enter grades in a grade book.

Principal Meier wrote a "Letter of Reprimand" to the plaintiff on January 31, 2003, regarding the plaintiff entering grades late.  Principal Meier noted that second quarter grades were due January 10, 2003, and that the plaintiff did not enter grades until January 30, 2003, and then only with the help of Principal Meier.

On February 2, 2003, Principal Meier wrote a memorandum concerning the plaintiff's progress in relation to her plan of assistance.[3]  In the memorandum, Principal Meier outlines several complaints by students and parents concerning missing and untimely grades.  Principal Meier wrote, in relevant part:

> but as of January 30th, I am very aware of the amount of missing work.  My visit to your room to help you enter grades, allowed me to observe first hand that there were a large number of assignments not being recorded in Grade Quick in a timely manner. . . .  You have had a number of opportunities to have your work placed in the Grade Quick. I have offered you along with the other staff, the opportunity to come to the building on weekends to work in your room. . . .  However, with these opportunities, the grades

---

[3] The court notes that the documents included in the defendant's exhibits, labeled "Plan of Assistance for Improving Teacher Performance," (see Defendant's exhibits CC and OO) are neither signed nor dated.  Accordingly, the court will not consider the documents in its statement of material facts taken in a light most favorable to the plaintiff.

> were not recorded . . . in a timely manner. On March 25, a
> final evaluation of the performance will be completed. If the
> deficiencies are not improved, I will not be able to recommend
> your continued employment in the Waterloo schools.

The plaintiff signed this memorandum. Principal Meier wrote a letter to the plaintiff on February 3, 2003, notifying her that she would be relieved of her classroom duties for that week so that she would have time to complete the grading of assignments and enter the grades into Grade Quick by 3:00 p.m. on February 7, 2003.

Principal Meier wrote a "Letter of Reprimand" to the plaintiff on February 13, 2003. He wrote, in relevant part:

> As of February 11, [2003] the grades for 3rd quarter were not
> up to date in the computer grade book. . . . You were given
> the week of February 3-7 to catch-up on all your grades. You
> were not required to teach any class, nor were you asked to
> attend lengthy meetings during that week. This should have
> been more than a sufficient amount of time to be caught up in
> recording grades.

The plaintiff signed the reprimand with the notation "I am signing under protest." Principal Meier issued another "Letter of Reprimand" to the plaintiff on February 23, 2003. This letter of reprimand indicated that the plaintiff continued to have difficulty recording grades in a timely manner. It is noted on the letter that the plaintiff refused to sign it. Principal Meier issued a directive to the plaintiff on February 28, 2003, concerning the plaintiff's handling of an inquiry regarding grades by some concerned parents. Principal Meier wrote, "[m]y directive is that you will need to answer, in writing, the questions directed in this letter [written by a student's parents.]" It is indicated that the plaintiff refused to sign the directive. Another "Letter of Reprimand" was issued to the plaintiff on March 6, 2003, indicating that the plaintiff's grades were not being recorded in a timely manner. The plaintiff refused to sign the letter. Principal Meier wrote a letter of reprimand to the plaintiff on March 7, 2003, asserting that the

plaintiff had failed to comply with his February 28, 2003 directive that the plaintiff respond in writing to a parent's inquiry. Principal Meier wrote:

> I have made similar requests of almost all of the staff here . . . [i]f a parent wishes information regarding their child's grade, it is the responsibility of the teacher to respond to the request, in a timely manner. You have not done this in this case. I have to find you guilty of insubordination. This was a reasonable request, and I expect all staff to comply with such requests.

It is indicated that the plaintiff refused to sign the letter.

Principal Meier issued a letter of reprimand to the plaintiff on March 25, 2003. In the letter, he outlined a number of concerns regarding the plaintiff's grade recording. The plaintiff refused to sign the letter. On April 4, 2003, Principal Meier issued a letter of reprimand to the plaintiff, stating that she had failed to timely return some "edit sheets" that had been submitted to the teachers, and that her failure to timely do so "caused a delay in sending out report cards, along with failures," and was "not acceptable for any teacher." The plaintiff signed the letter, writing, "I did not receive this until the next morning. I returned the sheets as soon as I was made aware that the sheets were due. The last time I checked my mailbox the sheets were not there."

Principal Meier documented a purported "Harassment Incident" on April 10, 2003. Principal Meier wrote that he had been told that the plaintiff had "yelled" at two students and had engaged in a "shouting match" with them. The plaintiff indicated to Principal Meier that she had not raised her voice. Principal Meier wrote:

> At this point I informed Ms. King that she was being placed on Administrative Leave with pay. I asked Ms. King to provide me with a written statement of the events of this morning; along with the problems she and the other two girls had been having through the past week.

One of the student's parents completed a complaint form for allegations of harassment concerning this incident.

The plaintiff completed a complaint form for allegations of harassment and/or discrimination on April 11, 2003. The plaintiff alleged that she was suffering from harassment and discrimination based on her race and at the hands of Principal Meier, Ms. Frey, and some of the students' parents. She alleged that the harassment and discrimination had taken place during the 2001-2002, and 2002-2003 school years. The plaintiff described the harassment and discrimination, in relevant part, as follows:

> Inconsistent directives have been given to staff; I am repeatedly treated as if I have no rights, and have been told that I have no right to rebut comments or instructions given to me. I have been told that students will be believed over me, and students, parents, and other staff as well as administrators have been allowed to holler at me and try to intimidate and humiliate me. . . . Meetings have been scheduled without my prior knowledge of appointments. I have been called into meetings at the administrators whim, at which all present holler, belittle, and berate me. The hostile environment has led me to lock my door at various times of day, in the morning and after students leave, so that I can work safely and peacefully. . . . I have tried to tell Mr. Meier how mistreatment and the hostile environment has affected me; he responded negatively by blaming me, as did some staff.

The plaintiff filed a complaint with the Iowa Civil Rights Commission on April 19, 2003, following her employment with Hoover School being terminated by Principal Meier. In her complaint, the plaintiff asserted:

> An original complaint was filed through Waterloo Community Schools in 2001 and 2002. I feel that much of the actions taken this year were in retaliation for complaints filed earlier. I have been harassed . . . with repeated hollering, threats, and intimidation. Parents, students, and other staff have been allowed to holler at me, hurl insults, and disrespect me, while being told that 'I deserved such treatment from the students,' by one staff member. The principal and assistant principal repeatedly allowed parents and students to make false accusations against me, to belittle me, and to criticize everything that I teach. Mr. Meier told me that I 'don't have a right to a rebuttal,' when I complained about the disrespect

> that I was receiving. He also wrote reprimands for petty
> things, when I complained. He called meetings repeatedly,
> sometimes several a day, and especially several a week,
> without appointments. At the meetings, parents, sometimes
> students, and others holler at [me].

The Superintendent of the Waterloo Community School District completed a "Notice and Recommendation to Terminate Contract" form on April 23, 2003. The notice indicated that the superintendent would recommend in writing to the Board of Directors of the Waterloo Community School District that plaintiff's contract be terminated due to unsatisfactory performance as a teacher.[4] The notice further stated that the plaintiff would be furnished with "[a] listing of documents which may be presented to the Board at a private hearing and the names of persons who may address the Board in support of the superintendent's recommendation," at least five days prior to any private hearing. The notice further read:

> You are advised that within five (5) days of receipt of this
> written notice, you may request in writing to the Secretary of
> the Board of Directors, a private hearing with the Board. If
> you fail to timely request a private hearing, the Board may
> proceed and make a determination upon the Superintendent's
> recommendation.

The plaintiff made a written request for a private hearing, which was acknowledged by the Secretary of the Board of Education on April 28, 2003. In her request, the plaintiff requested a continuation of the private hearing, yet to be scheduled, and waived her right to a hearing being held within the time proscribed by Iowa Code § 279.15.

Ms. Frey wrote a memorandum on April 29, 2003, concerning the issue of handling the plaintiff's grading following the termination of her employment. She wrote, in relevant part:

> . . . I began inputting the grades and I was alarmed at the fact
> that I had assignments dated back to November and December

---

[4]The notice indicates that it was being given pursuant to Iowa Code § 279.15.

of 2002. . . . I found that many of the assignments not yet titled in the grade book had less than half of the class' papers given to me by Ms. King.

Rupa Reddy wrote a letter to the Board of Education on April 29, 2003. In her letter, Ms. Reddy stated, in relevant part:

I . . . volunteered in Ms. King's class 6 times during the 2001-2002 class year. She is a good teacher. She did not mistreat me or the kids. She disciplined the students only when they misbehaved. She took great interest in making her students understand the information she was teaching. She even held the Scripps Howard Spelling Bee Competition for the whole area 7 education area. I think she is a great teacher.

Ms. Turner completed a "Report of Level I Investigation" concerning the plaintiff on May 22, 2003. The report indicates that a student's parent complained that the plaintiff yelled at the student and talked with the students' peers about issues with the student. The report concerned events taking place on or about April 10, 2003. The complaint also alleged that the plaintiff "gets in [the parent's] daughter's face and talks to her inappropriately by yelling." The report noted that the plaintiff had been placed on administrative leave following the incident complained of.

The Secretary for the Board of Education of the Waterloo Community Schools sent a letter to the plaintiff on May 23, 2003; which stated in relevant part:

You are hereby notified that your private hearing with the Board of Education of the Waterloo Community School District on the Superintendent's Notice of a recommendation to the Board of Education to terminated your continuing contract with the School District will be held . . . on the 18th day of June, 2003, at 8:00 a.m. At that time and place, the Superintendent will present evidence and argument of all issues involved, and you may cross-examine, respond, and present evidence and argument on your own behalf relevant to all issues involved. If you do not appear at the private hearing, the Board may proceed and make a determination upon the Superintendent's recommendation.

The plaintiff was represented by Roger White at this time. On the plaintiff's behalf, Mr. White requested that the June 18, 2003 hearing be rescheduled because he had decided to retire early and there had been no other arrangements made for the plaintiff's representation.[5] The plaintiff asserts that following Mr. White's retirement, she represented herself "except when attorneys contacted [Defendant Waterloo School District] to tell its representatives that a violation of the law concerning COBRA had occurred."

The plaintiff completed a "Charge of Discrimination" for the Iowa Civil Rights Commission and Equal Employment Opportunity Commission on June 7, 2003. In the Charge, the plaintiff asserted:

> I was hired . . . as a teacher in 1991. I was assigned to the Hoover Middle School. I was the only black teacher. In August of 2001 and since, [I] have been subjected to different terms and conditions of employment and intimidated by the Respondent's staff and administration. On January 3, 2003, I complained to administration about being disrespected by the staff, parents and students. I was forced to attend meetings and was subjected to a hostile work environment and abusive treatment from staff. On April 10, 2003, I was placed on administrative leave and the Respondent principal recommended that I be terminated. The respondent accepted the principal's recommendation and my last day of work was April 10, 2003. . . . No reason was given for termination. . . . I believe that the Respondent discriminated against me in that I was subjected to different terms and conditions of employment because of my race . . .

On June 20, 2003, the Secretary of the Board of Education for the Waterloo School District sent a letter to the plaintiff, notifying her that her private hearing had been

---

[5] This information is contained in the affidavit of Stephen Powell, an attorney representing the Superintendent of the Waterloo Community School District. In his affidavit, Mr. Powell asserts that Mr. White called him prior to the June 18, 2003 hearing, requesting that the hearing be rescheduled because he had decided to take early retirement and no other arrangements had been made for the representation of the plaintiff. The plaintiff does not dispute this contention.

rescheduled for August 18, 2003. Approximately one week before the rescheduled hearing date of August 18, 2003, Rebecca Knutson, an attorney with the Davis, Brown, Koehn, Shors & Roberts firm in Des Moines, Iowa, contacted counsel for Defendant Superintendent of the Waterloo Community School District, advising that she would be representing the plaintiff and requesting an indefinite continuance of the hearing to allow her to prepare for it.[6] The hearing never took place.

Ms. Turner completed a "Report of Complaint for Alleged Harassment and/or Discrimination," on November 5, 2003, concerning complaints by the plaintiff on April 11, 2003. In the report, Ms. Turner outlined her investigation and determined that "no evidence was found that mistreatment or harassment based on race could be seen." As part of her investigation, Ms. Turner interviewed John Barker, a family support worker at Irving Elementary. Mr. Barker, an African American, reported that he had been made to feel different because of his race. He said that he wanted to talk about the Black History Program but felt that it was not supported in that attendance at the program was not made mandatory for staff, while attendance at vocal and instrumental music concerts was made mandatory. Mr. Barker reported that he felt he was not accepted at the school because of his race, and that he received undue scrutiny by many of the student's parents based solely on his race. Mr. Barker felt that he always had to "prove himself" to the administration and wondered if he was treated differently because of his race. The plaintiff was issued a Right to Sue letter on March 11, 2005.

### Summary Judgment: The Standard

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986). Once the movant

---

[6] This information is also based on Mr. Powell's affidavit. The plaintiff does not dispute Mr. Powell's contention in this regard.

has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which it will bear the burden of proof at trial, there are genuine issues of material fact." Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).

Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985) (quoting Impro Prod., Inc. v. Herrick, 715 F.2d 1267, 1272 (8th Cir. 1983)). The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. Id.

Although it has been stated that summary judgment should seldom be granted in employment discrimination cases, summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case. Helfter v. UPS, Inc., 115 F.3d 613, 615-16 (8th Cir. 1997). The plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action. Landon v. Northwest Airlines, 72 F.3d 620, 624 (8th Cir. 1995) (citing Reich v. Hoy Shoe Co., 32 F.3d 361, 365 (8th Cir. 1994)). A pro se complainant's pleadings are held to less stringent standards than formal pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 521 (1972) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ("We cannot say with assurance that under the

allegations of the pro se complaint, which we hold to less stringent standards than formal pleadings, it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'").

## Conclusions of Law

### A. Race Discrimination[7]

As stated above, the plaintiff's pro-se complaint can be fairly read to allege a claim of discrimination based on race. In order to move forward with her claim of race discrimination based on her termination, the plaintiff first must establish a prima facie case under Title VII. See McDonnell Douglas v. Green, 411 U.S. 792 (1973). "Under the McDonnell Douglas framework, a presumption of discrimination is created when the plaintiff meets her burden of establishing a prima facie case of employment discrimination. A minimal evidentiary showing will satisfy this burden of production." Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005) (citing Pope v. ESA Services, Inc., 406 F.3d 1001, 1006-07 (8th Cir. 2005)). Once the plaintiff establishes a prima facie case of discrimination, the employer must "promulgate a non-discriminatory, legitimate justification for its conduct, which rebuts the employee's prima facie case." Rodgers, 417 F.3d at 850 (citing Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1111 (8th Cir. 2001) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 501, 507 (1993)). If the employer meets this burden, the inference of discrimination disappears, and

---

[7] In her May 2, 2006, pro se reply brief, the plaintiff for the first time alleges that she was discriminated against on the basis of age and disability, in addition to race. The court does not consider the plaintiff's claims in this regard, as she has failed to exhaust her administrative remedies as concerns such claims. See e.g. Shelton v. Boeing Co., 399 F.3d 909, 912 (8th Cir. 2005) ("Exhaustion of administrative remedies is a condition precedent to the filing of an action under the ADEA [and ADA] in federal court. . . . The reason for requiring the pursuit of administrative remedies first is to provide the EEOC with an initial opportunity to investigate allegations of employment discrimination and to work with the parties toward voluntary compliance and conciliation.").

the plaintiff must then prove that the employer's proffered legitimate non-discriminatory reason is merely a pretext for discrimination.

In order to establish a prima facie case of race discrimination, the plaintiff must show that (1) she is a member of a protected group; (2) she was qualified for her position, i.e. that she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, i.e. that similarly situated employees outside of the protected class were treated differently. Rodgers, 417 F.3d at 850 (citing Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 944-45 (8th Cir. 1994)).

The defendants argue that the plaintiff's prima facie case fails because she "cannot show either that she was meeting her employer's legitimate job expectations or that similarly situated employees outside the protected class were treated differently." The court agrees. The undisputed evidence shows that the plaintiff failed to meet legitimate job expectations for some time and despite repeated direction, guidance, and warning. The record illustrates that the plaintiff failed to complete grading and record keeping tasks in a timely manner, to the detriment of her students. There is no evidence of record that the plaintiff's time constraints for record keeping and grade recording and reporting were any more stringent than those for the other teachers. The record indicates, in fact, that at one point the plaintiff was excused from her teaching duties for an entire week to allow her more time to complete her grade recording, and yet she still failed to do so.

Even assuming that the plaintiff had met her prima facie burden in this case, the court finds that the defendants have satisfied their burden of proof that there were legitimate non-discriminatory reasons for terminating the plaintiff's employment as a teacher. Again, the record is replete with evidence that the plaintiff failed to keep sufficient records concerning student grades, failed to record grades for assignments completed and turned in to her by her students, failed to timely report grades, and had

significant difficulty communicating effectively with several of her students and their parents concerning the students' progress and grades. Accordingly, the plaintiff's claim of race discrimination must fail.

## B. Retaliation

Title VII makes it unlawful for an employer to retaliate against an employee who engages in a protected activity, which can either be opposing an act of discrimination made unlawful by Title VII, or by participating in an investigation under Title VII. Hunt v. Nebraska Pub. Power Dist., 282 F.3d 1021, 1028 (8th Cir. 2002). "The elements of a prima facie case of retaliatory discrimination are: (1) the employee engaged in activity protected under Title VII; (2) an adverse employment action was taken against [him]; and (3) there was a causal connection between the two." Turner, 421 F.3d at 695-96. Once a prima facie case has been established, the burden shifts "back to the defendant to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the plaintiff to show that the defendant's reason was pretextual. Id. At 696. "A plaintiff can establish a causal connection between his complaints and an adverse action through circumstantial evidence, such as the timing of the two events." Generally, however, a temporal connection alone is not sufficient to establish a causal connection." Eliserio v. USA, Local 310, 398 F.3d 1071, 1079 (8th Cir. 2005).

The plaintiff alleges that the defendants retaliated against her in response to her "protestations about maltreatment." Specifically, the plaintiff alleges that the defendants retaliated against her when they terminated her for complaining of maltreatment, and when they subsequently barred her ability to conduct an investigation by locking the school doors and removing her complaints from her file. The court finds that the plaintiff has failed to satisfy her prima facie burden for her retaliation claim. First, the plaintiff has failed to establish that she engaged in protected activity under Title VII. Specifically, although the plaintiff complained to supervisors about "maltreatment," there is no indication that she complained to supervisors that she believed that such maltreatment was based on her race.

Even assuming that there was evidence that she had complained that the maltreatment was because of race, the plaintiff has failed to point to any evidence to demonstrate that there was a causal connection between the protected activity and her employment being terminated, other than possible temporal proximity. See Eliserio, 398 F.3d at 1079. Accordingly, the defendants' motion for summary judgment on the plaintiff's retaliation claim is granted.

## C. Harassment

The prohibition against discrimination in employment under Title VII is not limited to economic or tangible discrimination. When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated. Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993).

To prevail on her claim of racial harassment, the plaintiff must establish that: "(1) she is a member of a protected class; (2) unwelcome harassment occurred; (3) there is a causal nexus between the harassment and her protected-group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) [the defendants] knew or should have known of the harassment and failed to take prompt and effective remedial action." Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1048 (8th Cir. 2003); Robinson v. Valmont Indus., 238 F.3d 1045, 1047 (8th Cir. 2001). Further, "[t]he harassment must be both subjectively offensive to the employee and objectively offensive such that a reasonable person would consider it to be hostile or abusive." Turner v. Gonzales, 421 F.3d 688, 695 (8th Cir. 2005); Williams v. Mo. Dep't of Mental Health, 407 F.3d 972, 975 (8th Cir. 2005). Whether an environment is hostile or abusive cannot be determined by a mathematically precise test. It entails consideration of the entire record and all of the circumstances. There is no particular factor that must be present, but conduct that is merely offensive is insufficient to implicate Title VII. Quick v. Donaldson

Co., Inc., ___ F.3d ___ 1996 WL 420381 (8th Cir. July 29, 1996).[8]  "[A] claim of racial harassment in the workplace focuses on the pervasiveness of the racially discriminatory conduct and also the employer's possible knowledge of that conduct and failure to take remedial action." Tart v. Hill Behan Lumber Co., 31 F.3d 668, 673 (8th Cir. 1994) (citing Kopp v. Samaritan Health System, Inc., 13 F.3d 264, 269 (8th Cir. 1993)).

The plaintiff alleges that she was harassed in her employment as a teacher with the Waterloo School District on the basis of her race. Specifically, she asserts that she was harassed by students, parents, fellow teachers and other staff, and supervisors, based on her race. She alleges that Principal Meier and Ms. Frey "coaxed students by publicly humiliating the plaintiff," and otherwise undermining her ability to instruct and discipline students. She further alleges that students were sent back to class after she sent them out for disciplinary reasons, prompting some students to remark to others, "I told you nothing was going to happen." The plaintiff further alleges that the administration repeatedly reassigned trouble students from other classrooms to her classroom, "followed by negative comment[s] toward [the plaintiff," and that she received an "unfair load of new immigrants and other students, who required extra reading and other skills." She states that she was "expected to do what Defendants themselves could not do, with meager and inadequate supplies for more than one-third of the school year," whereas other staff members received adequate supplies. She additionally alleges that the defendants "have changed dates of papers and eliminated others." Further, the plaintiff contends that she was harassed by the administration when they referred parents to her to deal with criticisms over which she had no control, because the administration could not handle the situations. Finally, she alleges that the administration harassed her by calling meetings to "intimidate" her with "students written statements and notes of insult," and sending excessive notes, making repeated

---

[8] Quick is a sexual harassment case. However, there is no difference in the standards applicable to racially and sexually hostile work environments. West v. Philadelphia Electric Co., 45 F.3d 744, 753 n.7 (3d Cir. 1995).

24

interruptions of the plaintiff's schedule, speaking to the plaintiff in a derogatory manner both in front of others and alone, and changing students' grades even when the plaintiff provided evidence that some of the students had refused or failed to complete assignments.

The plaintiff has not alleged that she was subjected to racial epithets or other conduct typically associated with the denigration of African-Americans. Accordingly, the court must scrutinize the plaintiff's complaints, which can fairly be characterized as allegations of racially disparate treatment, in order to determine whether those complaints give rise to a claim for a racially hostile working environment. In Johnson v. Fort Wayne, Indiana, 91 F.3d 922 (7th Cir. 1996), the plaintiff similarly alleged a number of incidents of disparate treatment that did not rise to the level of racial slurs, epithets, or other overtly race-related conduct in the workplace. The plaintiff in Johnson, like the plaintiff here, relied in part upon the unsupported conclusions of various other employees that an atmosphere of bias and prejudice existed in his department and that a supervisor discriminated against other African-Americans. The court, in Johnson, stated in relevant part:

> Absent specific allegations of discriminatory or harassing conduct directed at Mr. Johnson, we agree with the district court that this evidence is insufficient to support any claim of a racially hostile work environment. We do not have in this record 'the quantity, frequency, and severity' of racial slurs that 'create a work environment so hostile as to discriminate against the minority employee.'. . . . The evidence is insufficient to show that 'the workplace is permeated with discriminatory intimidation, ridicule or insult that is sufficiently severe or pervasive to alter the conditions of [Mr. Johnson's] employment and create an abusive working situation.

Johnson, 91 F.3d at 938. See also Fontelroy v. Day & Zimmerman, Inc., 1996 WL 194426 (10th Cir. 1996); Thomas v. Shoney's, Inc., 1995 WL 391958 (4th Cir. 1995). The court's decision, in Johnson, is directly applicable to this case. The plaintiff's evidence in this case, concerning "maltreatment,"at the hands of administrators, students,

and parents, is simply insufficient to create a claim of hostile work environment, because the evidence is not shown to have any racial animus.

### D. Procedural Due Process

No State shall deprive any person of life, liberty or property without due process of law. United States Constitution, Amendment XIV, § 1. For a property interest to arise, a government employee must have a legitimate claim of entitlement to continued employment, as opposed to a mere subjective expectancy. Batra v. Bd. of Regents of Univ. of Nebraska, 79 F.3d 717, 720 (8th Cir. 1996). See Pace v. Moriarty, 83 F.3d 261, 262 (8th Cir. 1996). Due process claims are generally subjected to a two-part analysis: (1) is the asserted interest protected by the due process clause; and if so, (2) what process is due? Logan v. Zimmerman Brush Co., 455 U.S. 422, 428 (1982). In other words, in examining the plaintiff's procedural due process claim, the court must first determine whether the plaintiff's employment termination deprived her of a property interest and if such a property interest is indeed at stake, the court must then determine whether the manner in which the discipline was imposed satisfied constitutionally mandated protections. Gillard v. Norris, 857 F.2d 1095, 1098 (6th Cir. 1988) (citing Bd. of Regents v. Roth, 408 U.S. 564 (1972)). In Matthews v. Eldridge, the Supreme Court wrote, "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." Matthews v. Eldridge, 424 U.S. 319, 332 (1976). "The possession of a protected life, liberty, or property interest is thus a condition precedent to the government's obligation to provide due process of law" and where no such interest exists, there is no due process violation. Movers Warehouse, Inc. v. City of Little Canada, 71 F.3d 716, 718 (8th Cir. 1995).

To establish a due process violation, the plaintiff must first show that she has a protected property interest. Merritt v. Reed, 120 F.3d 124, 126 (8th Cir. 1997) (citing Shands v. City of Kennett, 993 F.2d 1337, 1347 (8th Cir. 1993)). An employee has a

property interest in his employment if he has a "legitimate claim of entitlement" to it. Winegar v. Des Moines Indep. Cmty. Sch. Dist., 20 F.3d 895, 899 (8th Cir. 1994) (citing Bd. of Regents v. Roth, 408 U.S. at 577). To determine whether an employee enjoys a protected property interest in continued employment, a court must look to state law. Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 601 (8th Cir. 2003) (citations omitted). A contract may create a property interest. See Brockell v. Norton, 688 F.2d 588, 590-91 (8th Cir. 1982). "A property interest in employment can also be created by implied contract, arising out of customs, practices, and de facto policies." Winegar v. Des Moines Indep. Comm. School Dist., 20 F.3d at 899 (citing Perry v. Sindermann, 408 U.S. 593, 601-02 (1972)). "When such a property interest exists, the employee is entitled to a hearing or some related form of due process before being deprived of the interest." Id. (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985)). The "Due Process Clause does not convert the federal courts into arbitral forums for review of those commonplace personnel decisions that public agencies routinely make." Winegar, 20 F.3d at 901 (citing Miller v. Lovell, 14 F.3d 20 (8th Cir. 1994) ("We do not view this as a case involving mundane day-to-day details of school administration . . . [there are] far reaching repercussions and [the discharged teacher] deserved a meaningful chance to confront those allegations.)

The plaintiff claims that she was denied her procedural due process rights when her employment with the Waterloo Community School District was terminated without a hearing. Clearly, the plaintiff has a protected property interest in her employment and in her income by virtue of her contract with the Waterloo School District under Iowa Code §§ 279.13-.19. Accordingly, the court must determine what process was due to the plaintiff as concerns her protected property interest in continued employment. "The fundamental requirement of due process is the opportunity to be heard at 'a meaningful time and in a meaningful manner.'" Matthews v. Eldridge, 424 U.S. at 333 (citing Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). In the termination context, the Supreme

Court has found that, at a minimum, due process requires that an employee be given notice of the charges against him and some type of hearing prior to discipline by termination. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. The Court concluded that a tenured public employee to whom a post-termination hearing is available is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and the opportunity to present his side of the story." Id. at 546. The Supreme Court has also held that due process "is a flexible concept that varies with the particular situation." Zinernom v. Burch, 494 U.S. 113, 127 (1990). To determine what process is due in any particular case, a court must weigh:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. (quoting Matthews v. Eldridge, 424 U.S. at 335).

The existence of a constitutionally protected property interest in government employment must be determined with reference to applicable state law. Winegar v. Des Moines Community School Dist., 20 F.3d 895 (8th Cir. 1994). Iowa Code § 279.13 prescribes procedures for the automatic continuation of teacher contracts, in relevant part, as follows:

> The contract shall remain in force and effect for the period stated in the contract and shall be automatically continued for equivalent periods except as modified or terminated by mutual agreement of the board of directors and the teacher or as terminated in accordance with the provisions specified in this chapter.

Iowa Code § 279.15 provides for a notice of termination and request for hearing, in relevant part, as follows:

> Notification of recommendation of termination of a teacher's contract shall be in writing. . . . Within five days of the receipt of the written notice that the superintendent is recommending termination of the contract, the teacher may request, in writing to the secretary of the board, a private hearing with the board. The private hearing . . . shall be held no sooner than ten days and no later than 20 days following the receipt of the request unless the parties otherwise agree.

In considering the risk of an erroneous deprivation and the probable value of additional procedural safeguards, the court must evaluate both the predeprivation and postdeprivation procedures utilized in this case. Winegar, 20 F.3d at 901. Predeprivation procedures may be found adequate where the discharged employee is given a meaningful chance to challenge the outcome of those procedures. Id. It is not enough to simply rely upon an extensive record of investigation and warning concerning subpar performance as constituting an adequate opportunity to be heard. Id. ("No matter how elaborate, an investigation does not replace a hearing.")

In this case, the defendants' decision to terminate the plaintiff's employment "occasioned the sort of irreparable consequences that entitled [the plaintiff] to a full-blown hearing at some point." Id. (citing Goldberg v. Kelly, 397 U.S. 254, 264 (1970)). However, the court finds that the plaintiff waived her right to such a hearing by repeatedly causing the hearing to be postponed, through her representatives. The plaintiff's assertion, that the defendants "had constant contact with [her] and had every opportunity to inform [her] of rescheduling," does not sufficiently rebut the fact that she was ultimately responsible for the hearing never being held. According to Mr. Powell's undisputed affidavit testimony, it was the plaintiff's representative, Ms. Knutson, who requested an indefinite continuance of the August 18, 2003 hearing, for purposes of preparation. Accordingly, the defendants' motion for summary judgment as to the plaintiff's procedural due process claim must be granted.

Upon the foregoing,

IT IS ORDERED that the defendants' motion for summary judgment (docket number 11) is granted and this case is dismissed. The Clerk of Court shall enter judgment for the defendants.

June 6, 2006.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT